IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | |
|---|---|
| OCIE WOOD, JR., ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | CIVIL ACTION NO. 2:11-cv-136-WHA |
| ) | (WO) |
| BAILEY-HARRIS CONSTRUCTION ) | |
| COMPANY, INC., ) | |
| ) | |
| Defendant. ) | |

**MEMORANDUM OPINION AND ORDER**

**I. INTRODUCTION**

This case is before the court on a Motion for Summary Judgment filed by Defendant, Bailey-Harris Construction Company, Inc. ("Bailey-Harris"), on March 2, 2012 (Doc. # 18). The Plaintiff, Ocie Wood, Jr. ("Wood"), filed a Complaint on February 25, 2011 (Doc. # 1), alleging two counts: Count One – racial discrimination brought pursuant to Title VII and 42 U.S.C. § 1981, and Count Two – retaliation brought pursuant to Title VII and 42 U.S.C. § 1981. Wood filed a Response to Bailey-Harris's Motion for Summary Judgment (Doc. # 41) on May 25, 2012, and Bailey-Harris filed a Reply to Wood's Response (Doc. # 42) on June 1, 2012.

The court has federal question subject matter jurisdiction over these claims. *See* 28 U.S.C. § 1331.

For the reasons to be discussed, the Defendant's Motion for Summary Judgment is due to be GRANTED.

## II.  SUMMARY JUDGMENT STANDARD

Summary judgment is proper "if there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

The party asking for summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion," relying on submissions "which it believes demonstrate the absence of a genuine issue of material fact." *Id.* at 323.  Once the moving party has met its burden, the nonmoving party must "go beyond the pleadings" and show that there is a genuine issue for trial.  *Id.* at 324.

Both the party "asserting that a fact cannot be," and a party asserting that a fact is genuinely disputed, must support their assertions by "citing to particular parts of materials in the record," or by "showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1)(A), (B).  Acceptable materials under Rule 56(c)(1)(A) include "depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials."

To avoid summary judgment, the nonmoving party "must do more than show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).  On the other hand, the evidence of the non-movant must be believed and all justifiable inferences must be drawn in its favor.  *See Anderson v. Liberty Lobby*, 477 U.S. 242, 255 (1986).

After the nonmoving party has responded to the motion for summary judgment, the court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a).

### III. FACTS

The following is an account of the relevant facts with all justifiable inferences drawn in favor of the non-moving party:

The Retirement System of Alabama ("RSA") commissioned a construction project for a twelve-story office building on Dexter Avenue in Montgomery, Alabama.  The Defendant, Bailey-Harris, entered a successful bid to become the Prime Contractor for the RSA's Dexter Avenue building project ("the Project").  RSA also retained JESCO, Inc. ("JESCO") to serve as the Construction Manager for the Project.  Bailey-Harris subcontracted different aspects of the Project including most aspects of the concrete work.

In the spring of 2009, Wood, an African-American, sought employment from Bailey-Harris.  Initially, David Nowling ("Nowling"), who served as Bailey-Harris's concrete superintendent, explained to Wood that the concrete finishing work was still being subcontracted out but that Bailey-Harris would eventually be looking to employ concrete rubbers.  Concrete rubbing is a process generally used to remove superficial defects in the concrete.  Concrete finishing, however, is a more involved and skilled process which is done to smooth, compact, and level horizontal concrete slabs.

As of February and March 2009, the concrete rubbing work on the Project was behind schedule and was not of acceptable quality.  Bailey-Harris brought in a concrete specialist from another company in an attempt to fix the problems with the concrete, but the specialist was

unable to remedy the problem.  Accordingly, Bailey-Harris determined that a conventional concrete rubbing technique was going to be insufficient and instead began to experiment off-site with different concrete rubbing techniques.  Bailey-Harris finally decided on a method of concrete rubbing which involved the use of a cementitious product called Tammscoat.  Bailey-Harris obtained the approval of the architects employed on the Project to use Tammscoat and began using the new concrete rubbing process on May 13, 2009.  The new process consisted of two distinct parts.  First, from May 13, 2009 until June 24, 2009, the concrete rubbers were to create a uniform texture on the concrete.  Then on June 24, the concrete rubbers would begin to apply the Tammscoat product to the concrete using rollers.

 Wood was hired by Bailey-Harris in early June, and began work on June 3, 2009.  Prior to being hired, Wood was interviewed by Nowling and the Senior Project Superintendant for Bailey-Harris, Bobby Cumbess.  During that interview, Nowling and Bobby Cumbess learned that Wood had extensive experience in the concrete industry as a finisher, rubber, foreman, and a supervisor.  They also learned that Wood wanted a foreman or finisher position and expected a pay rate of $18.00 or $20.00 an hour.  Instead, Wood was hired by Bailey-Harris as a concrete rubber at a rate of $12.00 an hour, which was a wage that was equal to or higher than the wage that all other concrete rubbers were making.  Wood complained about this wage to Nowling who told him that after the economy picked up Wood would be able to get a higher wage.

 Wood's first job assignments were consistent with the first phase of Bailey-Harris's new concrete rubbing plan, and accordingly, he spent most of his time working on defects in the concrete.  Wood received no disciplinary action for his work during this time.

In mid-June, Nowling found it increasingly difficult to supervise all of the concrete work for the Project, so he decided to hire a foreman to help him supervise. Bobby Cumbess's son, Bo Cumbess, who is white, was hired for the position. Nowling testified in his deposition that he hired Bo Cumbess because of Bobby Cumbess's recommendation and because he had experience with stucco, dry wall, concrete, and Tammscoat, and had supervisor experience. Bo Cumbess was hired to be a foreman, although Bailey-Harris's internal paperwork at the time of the hire listed Bo Cumbess as a "Carpenter's Helper" instead of a foreman. Bo Cumbess's wage was $13.00 an hour.

The position for which Bo Cumbess was hired was not publically posted, and Wood was not given an opportunity to apply for the position despite Nowling knowing that Wood was interested in a foreman or supervisor position and that Wood had served in the concrete industry longer and had more experience than Bo Cumbess. Wood, despite having never seen Bo Cumbess's resume, has testified in his deposition that he did not think that Bo Cumbess had ever worked in concrete and that Bo Cumbess had no idea what he was doing. He further testified that he had to train Bo Cumbess because he was not able to perform the work. Bailey-Harris has put forth undisputed evidence that Bo Cumbess had experience both with rubbing concrete and applying the Tammscoat product. Wood's experience was solely with concrete rubbing and finishing. Moreover, Bo Cumbess was hired just before the second phase of the concrete rubbing process, the Tammscoat application phase, was to begin.

It is undisputed that Wood and Bo Cumbess filled two different roles at Bailey-Harris, that Wood was aware that Bo Cumbess was his foreman, and that Bo Cumbess was paid a higher

wage than Wood. Wood testifies that it is his belief that Bo Cumbess's hiring was due to his skin color and his being Bobby Cumbess's son.

On July 6, 2009, Wood complained to Dennis Gillispie ("Gillispie"), who was a Supervisor of the Project, and Bobby Cumbess that he was being discriminated against by Bailey-Harris and that he was underpaid because of his race. Wood told Gillispie that Bailey-Harris did not pay "Blacks" the same as "Hispanics" and "Whites." Wood also showed Gillispie that he had the business card for EEOC investigator Kevan Jackson ("Jackson"), but the evidence before the court from Wood's deposition makes it clear that Wood never spoke about or made any complaint about Bailey-Harris to Jackson.

However, the July 6, 2009 Daily Report written by Nowling states that Wood told Nowling that the EEOC had contacted him about Bailey-Harris, and Nowling passed this information on to Wendy Michael at the home office of Bailey-Harris so that she could be expecting a call from the EEOC. Nowling, Bobby Cumbess, and Gillispie all met with Richard Lovelace ("Lovelace"), who was the Senior Project Manager, to share Wood's complaint with him. Although, all four of the men discussed the complaint, no further action was taken as to Wood's complaint, and there is no evidence before the court that Jackson or anyone else with the EEOC contacted Bailey-Harris about the July 6, 2009 incident.

Wood also testified that he believed that Gillispie and Bobby Cumbess did not take his complaint seriously because nothing changed.

On August 15, 2009, Nowling was in the vicinity of Wood as he was complaining to another worker about Bo Cumbess being hired as foreman of the rubbing crew. Nowling heard the complaint and explained to Wood that he was being paid fairly, that he was not being paid

less than any of his coworkers, and that it was not good for the company to have one person attempting to stir up controversy among the workers by causing a mutiny. Nowling reported Wood's August 15, 2009 complaint to Lovelace, but there is no evidence that any further action was taken to investigate Wood's complaints.

On August 20, 2009, after Wood and Rodney Smith ("Smith"), another African-American concrete rubber employed with Bailey-Harris, finished their work day, the two workers went to the RSA building in order to complain to Dr. Bronner, the CEO of RSA, about their discriminatory pay rates, and also about what they contended was poor quality work being done by Bailey-Harris. When the two men arrived at the RSA building, they asked the security guard to let them speak to Dr. Bronner about these complaints, but Dr. Bronner's office instead contacted Brian Slaughter ("Slaughter"), Senior Project Manager for JESCO, to come down to speak with the two men. The two men complained to Slaughter that Bailey-Harris was engaging in racial discrimination by paying both men too little and also that Bailey-Harris was engaging in low quality work on the RSA building. Slaughter testified that one of the men was speaking in an elevated voice and that it was clear that both men were upset; however, Slaughter testified that the men were not acting hostile. After hearing the two men's complaints, Slaughter then asked the two men to leave, and they complied. After the two men had left, Slaughter called Lovelace to tell him about the incident. Lovelace then contacted Nowling. Nowling, Gillispie, and Tony Burnham ("Burnham"), Bailey-Harris's Site Safety Manager, went to the RSA building to see which two employees had been complaining.

By the time that Nowling, Gillispie, and Burnham arrived at the RSA building, Smith and Wood had already left. However, the three men asked Slaughter for details about the incident.

7

Slaughter informed the men about the identity of the two complaining employees, and also about the content of their complaints: that the men felt that they were underpaid, that the work that Bailey-Harris was doing was of low quality, and that Bailey-Harris was trying to cover up shoddy work. Moreover, Slaughter explained that Wood and Smith complained about having to train "Mexican" employees who were making more money than they were. Nowling documented the events that took place at the RSA building and noted that Wood and Smith had complained about their wages and had done so in a loud manner.

The next day, August 21, 2009, Lovelace, Burnham, Nowling, and Gillispie met with Wood and Smith to discuss the events at the RSA building. Lovelace, Burnham, Nowling, and Gillispie told Wood and Smith that the two used an improper method to express their complaints about Bailey-Harris and reprimanded the two for making damaging remarks about Bailey-Harris's work to Slaughter. Ultimately, Lovelace, Burnham, Nowling, and Gillispie decided that Bailey-Harris would not be able to pay Wood and Smith a wage that would satisfy them, and decided to terminate Wood and Smith because of that fact and because of Wood and Smith's decision to disparage Bailey-Harris to JESCO and Slaughter.

Bailey-Harris did not replace Wood or Smith, opting instead to continue with a smaller concrete rubbing crew. After his termination, Wood filed a Charge of Discrimination with the EEOC on November 19, 2009, and, after the EEOC notified Wood that it was going to dismiss his Charge of Discrimination with a no cause finding, Wood requested his Right to Sue letter from the EEOC.

Lastly, the court also notes that Bailey-Harris had a written policy prohibiting workplace discrimination and harassment which Wood signed when he was hired. However, Bailey-Harris

did not appear to have a policy in place for reporting such discrimination in-house. Nor did Bailey-Harris appear to have any specific anti-retaliation plan in place, and Nowling, despite being a concrete superintendent, had no training as to retaliation.

## IV. DISCUSSION[1]

### A. Count One – Discrimination Claim

Title VII prohibits employers from discriminating "against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a). Similarly, § 1981 prohibits racial discrimination by an employer. *See, e.g.*, *Sledge v. Goodyear Dunlop Tires N. Am. Ltd.*, 275 F.3d 1014, 1015 (11th Cir. 2001). In order for Wood to prove his employment discrimination case, he must "prov[e] discriminatory treatment by a preponderance of the evidence." *Earley v. Champion Intern. Corp.*, 907 F.2d 1077, 1081 (11th Cir. 1990). Woods has alleged that Bailey-Harris has intentionally discriminated against him, but Wood relies on circumstantial evidence to establish Bailey-Harris's discriminatory intent. This means that the court must use the familiar *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973) burden-shifting framework to analyze Wood's claims.

This framework first requires a plaintiff to make out a prima facie case of discrimination. *Combs v. Plantation Patterns*, 106 F.3d 1519, 1527-28 (11th Cir. 1997). Next, the defendant is given an opportunity to produce a legitimate, nondiscriminatory reason for the challenged employment action. *Id.* at 1528. Moreover, "[i]t is important to bear in mind, however, that the

---

[1] The same analysis and framework applies both to Title VII and § 1981 claims. *See Sledge*, 275 F.3d 1014,1015 n. 1 (11th Cir. 2001) (citing *Trotter v. Board of Trs. of Univ. of Alabama*, 91 F.3d 1449, 1454 (11th Cir. 1996)).

defendant's burden of rebuttal is exceedingly light." *Perryman v. Johnson Products Co., Inc.*, 698 F.2d 1138, 1142 (11th Cir. 1983).  Once the defendant has met his burden, the plaintiff is given an opportunity to "come forward with evidence, including the previously produced evidence establishing the prima facie case, sufficient to permit a reasonable factfinder to conclude that the reasons given by the employer were not the real reasons for the adverse employment decision." *Combs*, 106 F.3d at 1528.

Wood cites *Smith v. Lockheed-Martin Corp.*, 644 F.3d 1321 (11th Cir. 2011), for the proposition that "[a] triable issue of fact exists if the record, viewed in a light most favorable to the plaintiff, presents 'a convincing mosaic of circumstantial evidence that would allow a jury to infer intentional discrimination by the decisionmaker.'" *Id.* at 1328 (quoting *Silverman v. Bd. of Educ.*, 637 F.3d 729, 734 (7th Cir. 2011)).  However, to the extent that *Smith* stands for an alternative means of defeating summary judgment in a Title VII case, it is easily distinguishable from the present case in light of the weight and volume of the evidence before the *Smith* court and dearth of evidence before this court.  Moreover, there is such limited evidence before this court that Wood cannot discredit the legitimate, nondiscriminatory reasons that Bailey-Harris has proffered to explain the reasons for the actions taken against Wood.

The court will now address the three instances of racial discrimination raised by Wood: discrimination as to his termination, wages paid, and failure to promote.

i. Termination

In order to demonstrate a prima facie case of unlawful termination due to racial discrimination the plaintiff must show that (1) he is a member of a protected class, (2) he was qualified for the position, (3) he suffered an adverse employment action, and (4) he was replaced

by a person outside his protected class or was treated less favorably than a similarly-situated individual outside his protected class. *Maynard v. Board of Regents of Div. of Univs. of Fla. Dept. of Educ. ex rel. Univ. of S. Fla.*, 342 F.3d 1281, 1289 (11th Cir. 2003). In this case, it is clear that Wood was a member of a protected class, was qualified for his position, and that he suffered an adverse employment action; however, the evidence before the court does not establish that Wood was replaced by anyone or that a similarly-situated individual outside his protected class was treated more favorably.

The undisputed evidence is that after terminating Wood and Smith, Bailey-Harris continued the concrete rubbing job without hiring anyone to replace the two employees. Moreover, there is no evidence before the court that any similarly-situated individuals were treated in a more favorable way than Wood. However, even if the court were to assume that this fact were true so that Wood could establish his prima facie case of discrimination, he still has failed to rebut Bailey-Harris's proffered legitimate, nondiscriminatory reason for terminating him.

Wood's response brief is devoid of any citations to the record which demonstrate that Bailey-Harris considered race in regards to his termination. Bailey-Harris has explained, and the record evidence shows, that Wood was terminated because of his conduct at the RSA building on August 20, 2009 which damaged Bailey-Harris's reputation with JESCO and Dr. Bronner. The only evidence offered by Wood are his complaints to various Bailey-Harris employees, which is insufficient "to permit a reasonable factfinder to conclude that the reasons given by the employer were not the real reasons for the adverse employment decision." *Combs*, 106 F.3d at 1528. Accordingly, Wood has failed to meet his burden in this case and cannot, as a matter of law,

demonstrate any racial discrimination as to the decision of Bailey-Harris to terminate him. Therefore, summary judgment will be entered in favor of Bailey-Harris as to this claim.

### ii. Wages Paid

Wood has raised a claim of racial discrimination as to the wages he received for the work he performed for Bailey-Harris. In order to demonstrate a prima facie case of disparate treatment, Wood must show "that [he] was a qualified member of a protected class and was subjected to an adverse employment action in contrast with similarly situated employees outside the protected class." *Wilson v. B/E Aerospace, Inc.*, 376 F.3d 1079, 1087 (11th Cir. 2004). While it is true that "[t]he methods of presenting a prima facie case are not fixed," Wood must demonstrate that some similarly-situated individual who was not in his protected class received better treatment than he did. In this case, Wood has not.

The evidence is undisputed that Wood was paid more than or equal to each of his fellow concrete rubbers. Regardless of his particular subjective view about his worth, Bailey-Harris paid him as much as any of the other concrete rubbers, and, therefore, Wood has failed to meet his prima facie case as to racial discrimination as to the wages he received from Bailey-Harris. However, because it appears that Wood has selected Bo Cumbess as the comparator for his racial discrimination claim, the court will analyze his claim in light of this assertion to determine if that has established Wood's prima facie case of racial discrimination.

The evidence before the court is that Bo Cumbess did receive a higher wage than Wood, $13.00 per hour instead of $12.00 an hour, and that Bo Cumbess is outside of Wood's protected class. Moreover, Wood and Bo Cumbess did have some overlapping duties in their respective jobs. However, it is also undisputed that Wood and Bo Cumbess had different job titles, job

duties, work backgrounds, and experience with Tammscoat. It is undisputed that Bo Cumbess was hired to be Wood's supervisor, and it is also undisputed that Bo Cumbess had experience with the Tammscoat product and that Wood did not. It appears clear to the court that Bo Cumbess is not an appropriate comparator for Wood. As explained by the Eleventh Circuit, "[t]he comparator must be nearly identical to the plaintiff to prevent courts from second-guessing a reasonable decision by the employer." *Wilson*, 376 F.3d at 1091. In this case, a comparison of Bo Cumbess and Wood, given the significant number of relevant differences between the two, would lead to this court improperly second guessing the decisions made by Bailey-Harris.

However, even if the court did assume that Wood has proved his prima facie case, he has failed to demonstrate how Bailey-Harris's legitimate, nondiscriminatory reason for paying Bo Cumbess more, i.e., his experience with Tammscoat which was to be used by Bailey-Harris in the second phase of its concrete project, was somehow pretext for racial discrimination. Again, the only evidence before the court for this is Wood's unsupported assertions that Bailey-Harris engaged in racial discrimination. Again, Wood's complaints standing alone are not sufficient "to permit a reasonable factfinder to conclude that the reasons given by the employer were not the real reasons for the adverse employment decision." *Combs*, 106 F.3d at 1528. Accordingly, Wood has failed to meet his burden in this case and has not demonstrated any racial discrimination as to Bailey-Harris's decisions as to the amount to pay him or Bo Cumbess, as a matter of law. Therefore, summary judgment will be entered in favor of Bailey-Harris as to this claim.

### iii. Failure to Promote

In order for Wood to make out a prima facie case of failure to promote, he must demonstrate that "(i) he belonged to a protected class; (ii) he was qualified for and applied for a position that the employer was seeking to fill; (iii) despite qualifications, he was rejected; and (iv) the position was filled with an individual outside the protected class." *Vessels v. Atlanta Independent School System*, 408 F.3d 763, 768 (11th Cir. 2005) (citing *McDonnel Douglas Corp.*, 411 U.S. at 802). The Eleventh Circuit has also held that "where an employer does not formally announce a position, but rather uses informal and subjective procedures to identify a candidate, a plaintiff need not show under the second prong that he applied for the position—only that the employer had some reason to consider him for the post." *Id.* (citing *Jones v. Firestone Tire & Rubber Co.*, 977 F.2d 527, 533 (11th Cir. 1992)). However, the employee must still show that he was qualified for the position in order to make out his prima facie case for discrimination. *Jones*, 977 F.2d at 533.

Given the evidence before the court, Wood is unable to meet the requirements of the prima facie case for his failure to promote claim. While he is able to demonstrate that he is a member of a protected class and that Bo Cumbess, who was not part of Wood's protected class, got the position instead of Wood, he is unable to demonstrate that he was qualified for the foreman position.

The testimony from Bailey-Harris's personnel was that the foreman for the concrete rubbing team was to have Tammscoat experience because of Bailey-Harris's impending use of that particular product in June 2009. It is undisputed that Bo Cumbess had that experience and Wood did not. Wood has testified that he was capable, indeed more capable, of doing the

concrete rubbing foreman position than Bo Cumbess, but it is clear that Wood was not responsible for setting the requirements of the foreman position. *See Chapman v. AI Transport*, 229 F.3d 1012, 1020 (11th Cir. 2000) (explaining that an employee may not substitute his business judgment for the employer's, and an employee cannot succeed in rebutting the employer by "simply quarreling with the wisdom" of the employer). While it is clear that Wood had more years of experience in the concrete industry than Bo Cumbess, it is equally clear that Wood lacked two key characteristics that Bo Cumbess possessed: his knowledge of Tammscoat and his reputation as Bobby Cumbess's son.

Even if Wood had succeeded in demonstrating that he was qualified for this position, he still failed to demonstrate that Bailey-Harris's proffered legitimate, nondiscriminatory reasons for failing to promote Wood were pretext for racial discrimination. Once again, those reasons are that Bo Cumbess had experience with the Tammscoat product and was also Bobby Cumbess's son. Neither of those reasons applies to race and neither of those reasons is illegal. Essentially Wood's only evidence for racial discrimination is that Bo Cumbess was hired, he was white, and Wood did not think he was qualified. This evidence is insufficient "to permit a reasonable factfinder to conclude that the reasons given by the employer were not the real reasons for the adverse employment decision." *Combs*, 106 F.3d at 1528. Accordingly, Wood has failed to meet his burden in this case and cannot demonstrate any racial discrimination as to Bailey-Harris's decision not to promote Wood, as a matter of law. Therefore, summary judgment will be entered in favor of Bailey-Harris as to this claim.

### B. Retaliation Claim

Wood has also raised a claim of retaliation against Bailey-Harris stemming from his termination.

"A prima facie case of retaliation under Title VII requires the plaintiff to show that: (1) [he] engaged in an activity protected under Title VII; (2) [he] suffered an adverse employment action; and (3) there was a causal connection between the protected activity and the adverse employment action." *Crawford v. Carroll*, 529 F.3d 961, 970 (11th Cir. 2008) (citing *Pennington v. Citiy of Huntsville*, 261 F.3d 1262, 1266 (11th Cir. 2001)); *see also* 42 U.S.C. § 2000e *et seq.* (1982). "Once the plaintiff makes out a prima facie case, 'the burden shifts to the defendant to rebut the presumption of retaliation by producing legitimate reasons for the adverse employment action.'" *Sullivan v. National R.R. Passenger Corp.*, 170 F.3d 1056, 1059 (11th Cir. 1999) (quoting *Raney v. Vinson Guard Service*, 120 F.3d 1192, 1196 (11th Cir. 1997)). If the Defendant can produce such a reason, then the presumption of retaliation disappears, and the plaintiff must "show that the employer's proffered reasons for taking the adverse action were actually a pretext for prohibited retaliatory conduct." *Sullivan*, 170 F.3d at 1056.

Even if the court assumes that Wood has established a prima facie case of retaliation, Bailey-Harris is still due to prevail on its Motion for Summary Judgment because Wood has failed to even acknowledge Bailey-Harris's proffered legitimate, nondiscriminatory reason for Wood's termination. Bailey-Harris took no adverse action against Wood in response to in-house complaints of discrimination made by him before August 20, 2009, and Wood did not contact the EEOC before the August 20 incident. Wood was terminated only after going to the RSA building after work, telling the security guard that he wanted to talk to Dr. Bronner, the CEO of

the owner of the Project, about his pay and about the quality of the work being done by Bailey-Harris, and then voicing those complaints to Slaughter.  Bailey-Harris made clear in its Memorandum of Law in Support of Motion for Summary Judgment (Doc. # 18), with citations to evidence, its position that Bailey-Harris terminated Wood because of his action of complaining to Slaughter about the manner in which Bailey-Harris was performing the construction for the RSA project.  In other words, Bailey-Harris terminated Wood because of his disparaging comments about Bailey-Harris to Slaughter, a Senior Construction Manager for the client of Wood's employer, which had the effect of sabotaging the relationship between Bailey-Harris and its client's CEO, Dr. Bronner.  Bailey-Harris argues that such a reason is sufficient to serve as a legitimate, nondiscriminatory reason for terminating Wood citing *Rayford v. Wexford Health Sources, Inc.*, 400 F. App'x 100, 103 (7th Cir. 2010) (even allowing plaintiff's conduct of disparaging his employer to the employer's own Vice President of Human Resources to serve as a nondiscriminatory, legitimate reason for refusing to rehire the plaintiff) and *Williams v. Anheuser-Busch, Inc.*, 957 F. Supp. 1246, 1251 (M.D. Fla. 1997) (finding that evidence that the plaintiff "made disparaging, and potentially damaging, remarks about Defendant's products to three (3) individuals" while at a bar was a sufficient "nondiscriminatory justification for its termination of Plaintiff").  The court agrees.  Wood did not respond to this argument, contending only that all his actions were protected activity, and has pointed to no evidence which would serve to demonstrate that Bailey-Harris's proffered reason was merely pretext for illegal conduct.

     Because Wood has failed to rebut Bailey-Harris's proffered legitimate, nondiscriminatory reasons for his termination–despite it being his burden to do so–Bailey-Harris must prevail.  Therefore, the court will enter summary judgment in favor of Bailey-Harris as to Count Two.

## V. CONCLUSION

For the foregoing reasons, it is ORDERED as follows:

1. The Motion for Summary Judgment is GRANTED as to both Counts, and judgment will be entered in favor of Bailey-Harris.

Done this 27th day of July, 2012.

/s/ W. Harold Albritton
W. HAROLD ALBRITTON
SENIOR UNITED STATES DISTRICT JUDGE